**Wayne UHL, Plaintiff–Appellant,**

v.

**ZALK JOSEPHS FABRICATORS, INC., Heico, Inc., and Pettibone Corporation, Defendants–Appellees.**

No. 96–2529.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1997.

Decided Aug. 21, 1997.

Joan I. Schwarz (argued), Stoughton, WI, for Plaintiff–Appellant.

Steven P. Handler (argued), Kathryn T. Ditmars, McDermott, Will & Emery, Chicago, IL, Kevin F. Milliken, Hurley, Burish & Milliken, Madison, WI, for Defendants–Appellees.

Before POSNER, Chief Judge, and CUMMINGS and EVANS, Circuit Judges.

EVANS, Circuit Judge.

A jury found that Zalk Josephs Fabricators, Inc., a Stoughton, Wisconsin, firm which fabricates structural steel for buildings, demoted one of its employees, 57–year-old Wayne Uhl, because of his age. But Uhl claims that age was not the only reason why Zalk demoted him—he says the company also violated the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. The jury, however, didn't hear about the ADA claim because the district judge gave it the boot on summary judgment. It is that decision we review today on Uhl's appeal.

Zalk hired Uhl back in 1976 to work as a foreman. In 1988 Uhl became shop superintendent, and soon after that he was promoted again to plant manager, responsible for production, delivery schedules, and supervision of foremen. In the early 1990's Uhl's supervisor was David Sailing, who once worked for Uhl as a welder but then was promoted to the higher position of production manager. Sailing reported to Jerry Renz and Lou Gurthet, Zalk's vice-president and president. Through 1992, Uhl received satisfactory job performance evaluations from Sailing. In 1990, for instance, Sailing rated Uhl's performance as a 2.5 on a scale of 1 (high) to 5 (low).

In early February 1992 Uhl was ill and sweating excessively while on the job. Seeing Uhl looking poorly, Sailing told another employee "I should just fire [Uhl], because he is just not doing his job." A few days later Uhl was diagnosed as having diabetes. After the diagnosis, Sailing told Uhl about a diabetic friend whose limb had to be amputated and who was "really screwed up" because of it.

Uhl's diabetes, from what we can see, did not impair his ability to perform his job duties. In January 1993, though, Uhl received a poor evaluation from Sailing—a 3.88 rating. After Uhl complained that the evaluation was unfair, Sailing reconsidered and improved the rating slightly. Six months

later Sailing gave Uhl an evaluation noting "much improved" work performance, with a rating similar to the one he had back in 1990. On January 21, 1994, however, Uhl was demoted back to foreman, resulting in a $3,000 pay cut. The demotion occurred at the behest of Sailing, who complained to Renz and Gurthet about a lack of productivity, which Sailing attributed to Uhl's poor management. After Uhl's demotion, Sailing absorbed Uhl's job duties in addition to his own.

In June of 1995, Uhl filed a complaint alleging violations of both the ADA and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. In regard to the ADA claim, Uhl asserted that he was demoted either because of his diabetes or because Zalk perceived his diabetes to be a disability. In October 1995 Zalk filed an offer of judgment for $50,000 which Uhl, unwisely in hindsight, rejected. Zalk then moved for partial summary judgment on the ADA claim, arguing that Uhl could prove no causal connection between his demotion and his diabetes. District Judge Barbara Crabb granted the motion and denied Uhl's motion for reconsideration. In her written decision on the motion for reconsideration, the judge indicated that Uhl improperly labeled and presented as "new evidence" information from deposition transcripts that he could have brought to her attention prior to the summary judgment decision. The judge also concluded, however, that the tardy evidence made no difference in her decision.

At the end of a 1996 trial on the age discrimination claim the jury found Zalk liable, but the damages on that claim, both past and future, turned out (due to a stipulation) to be only $21,744. Because he recovered less than the offer of judgment (which Judge Crabb, over objection, found to be valid), Uhl had to pay Zalk's costs from the date of the offer.

■ Uhl appeals only the grant of partial summary judgment dismissing his ADA claim, but before we move to the issue we must address a preliminary matter regarding Uhl's appellate briefs. Zalk filed a motion to strike certain portions of Uhl's initial brief, claiming it relies on deposition testimony not presented to Judge Crabb prior to her summary judgment decision. Uhl refers to the deposition testimony of Deborah Lynch, Willard Reck, and three other co-workers. Our review of Uhl's filings in the district court (we note that Uhl changed attorneys after the trial) confirms that the referenced testimony of Lynch and Reck was not brought to Judge Crabb's attention until the motion for reconsideration, which was too late. As the judge indicated, Uhl knew about this evidence long before filing his summary judgment response brief, making the information from the depositions untimely. Moreover, much of the other testimony Uhl relies on now was not presented to the district court at all.

Uhl contends that he filed full deposition transcripts with the district court, so the now–referenced testimony is part of the record on appeal and we can consider it. Not so fast. We think it important to emphasize the proper presentation of evidence to the district court and to us. And here, Uhl provides a good example of what not to do.

■ None of the deposition testimony now mentioned was addressed in his brief in response to Zalk's November 1995 summary judgment motion. Although the earliest transcripts were filed in January 1996, which was prior to Judge Crabb's decision, they nevertheless were filed 6 weeks after Uhl's response brief and over a month after Zalk's reply; others, such as the Lynch deposition transcript, were filed after the summary judgment decision itself. Needless to say, a district judge isn't obligated to consider untimely presented evidence, and neither are we. In addition, relying simply on the fact that he filed the full transcripts with the clerk, Uhl never pointed out to the district judge the pertinent portions of testimony until the motion for reconsideration, and even then he didn't discuss all that he relies on now. Uhl bore the burden of identifying specific evidence so Zalk could respond and the court could determine whether a material issue of fact existed. The district court was not obligated to scour the record looking for factual disputes; the judge was not required to sift through every transcript Uhl filed to find testimony to back up his case. See *Flaherty v. Gas Research Institute*, 31 F.3d

451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir.1994); see also Fed.R.Civ.P. 56(e) (non-movant's response "must set forth specific facts showing that there is a genuine issue for trial" (emphasis added)). The motion to strike is granted. Now to the issue that is properly before us.

The ADA prohibits discrimination against a "qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). Like other discrimination suits, ADA cases can be established by direct evidence or through the *"McDonnell Douglas"* indirect method of proof. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ In the district court Uhl primarily argued that his demotion was linked to his diabetes because Zalk was a self-insured company motivated to keep its medical costs down. On appeal, Uhl abandons these financial motivations and takes a different tack. He now claims his demotion and disability (or perceived disability) are causally connected because: (a) he was a good worker and until his diagnosis received good performance evaluations and two promotions, but after the diagnosis he received a poor evaluation and then was demoted; (b) Sailing made comments indicating his bias against Uhl because of the disability; and (c) other Zalk employees believe Zalk discriminated against them (this argument is destined for doom based on our ruling on the motion to strike).

■ Uhl's evidence on causal connection (the "evidence," at least, that is properly in the record), even viewed in his favor as it must be, just doesn't amount to an ADA violation. Uhl in no way links his demotion to either his diabetes or any perception of disability by Zalk. In February 1992 Uhl, who co-workers say was a competent supervisor, was diagnosed with diabetes. His next evaluation, which indeed was a poor one, occurred almost a year later in January 1993. Uhl says that between his promotion to plant manager and this poor evaluation, "[t]he only change that had occurred ... was that he

was diagnosed with diabetes on February 12, 1992[;]" then, "shortly thereafter" he was demoted. While suspicious timing can constitute circumstantial, or indirect, evidence to support a claim of intentional discrimination, *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994), the points on Uhl's time line are few and far between. The poor evaluation he says was linked to his having diabetes came long after his diagnosis, and his demotion occurred in January 1994—2 years after the diagnosis. A year separation between the diagnosis of diabetes and the poor evaluation, with no intervening connecting events (or evidence suggesting that the employer was laying in the weeds intending to strike at a later time), is not particularly suspect, and 2 years between diagnosis and demotion is even less so. Suspicious timing is plausible when events occur over weeks or months perhaps, but not once per year with no other supposed discrimination occurring in between. Importantly, upon protest by Uhl, Sailing reassessed Uhl's performance and improved the January 1993 evaluation, and between that assessment and the demotion, Uhl received a satisfactory evaluation at the same rating level as that predating his diagnosis. This unpleasant circumstance botches up Uhl's attempt to tie even the poor evaluation and demotion together.

Similarly, Sailing's comments are too remote in time and context to causally connect Uhl's alleged disability and demotion. When Uhl looked sick in early February 1992 Sailing did say Uhl wasn't doing his job and should be fired. But that comment occurred before anyone, including Uhl, learned he had diabetes. Sailing's comment about his diabetic friend who was "screwed up" has not been shown to have any relation to Uhl's demotion at all. And although a co-worker testified at her deposition that Sailing "whined" four or five times about how Uhl had to take frequent breaks to eat due to his diabetes and the first comment of the sort occurred soon after the diagnosis, Uhl fails to indicate when during the 2–year period between diagnosis and demotion the others occurred. These stray remarks regarding Uhl's health or diabetes show no connection to the 1994 demotion.

■ Uhl, we think, conveniently ignores any evidence that his diabetes played no part in Zalk's decision to demote him. For instance, Sailing testified that he did not think the diabetes impaired Uhl's job performance. And while asserting that Sailing, Renz, and Gurthet discussed Uhl having diabetes, Uhl neglects to acknowledge that those conversations took place around the time he was hospitalized in 1992 and had nothing to do with his demotion, which was 2 years in the future. Finally, some of Uhl's co-workers testified that Sailing didn't work well with others and that Sailing and Uhl didn't get along. Combined with Sailing's pre–diagnosis statement that he should fire Uhl, the picture, at best, is one of a supervisor out to get rid of Uhl even before the diagnosis— meaning the ADA isn't implicated at all. A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability.

Uhl in fact admitted at his deposition that he had no proof of any causal connection. Uhl confessed that the only fact he knew which suggested a causal connection was that his bad evaluation followed his diagnosis. When asked whether he was aware of facts indicating diabetes played a part in his evaluation or the decision to demote him, he replied:

> I really don't know why I got this bad evaluation in 1992[sic]. If that was because of my diabetes and somebody thinks that that's a disability, I don't know, but that's the only thing that would, you know—I've been here 19 years. I've had all good—in my mind, I've had all good evaluations up to this evaluation, and then I become diabetic in February, and then I got a bad evaluation, and now I've had good evaluations. That's all I can read into that, so if that tells you something or me something, I don't know.

■ Uhl added at his deposition: "I didn't know what they were thinking, you know. I know what I felt." Speculation does not meet a party's burden in defending a summary judgment motion. *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir.1995). Facts, not an employee's perceptions and feelings, are required to support a discrimination claim.

■ We note finally that for purposes of Zalk's motion for partial summary judgment, Judge Crabb assumed Uhl satisfied another element of the prima facie case: being disabled as defined in the Act. The judge assumed for purposes of her decision that Zalk perceived Uhl to have a disability, as required by 42 U.S.C. § 12102(2)(C). We think Uhl also stumbles on this aspect of his prima facie case. On appeal, Uhl abandoned any argument that his diabetes was a disability under 42 U.S.C. § 12102(2)(A). In regard to a perceived disability, we have already noted that Sailing testified that Uhl's diabetes didn't affect Uhl's work performance. Gurthet said neither Renz nor Sailing expressed to him concern that Uhl was unable to perform his duties. Gurthet also said that soon after Uhl's hospitalization Renz, Sailing, and Gurthet discussed whether Uhl was keeping his diabetes under control at work, and "it appeared that he was." Uhl presented no contrary evidence, most likely because he couldn't. He was asked at his deposition what proof he had on this point:

> Q: Well, did anybody do anything that led you to believe that they perceived your diabetes was an impairment of your ability to perform your work duties?
>
> A: I don't believe so.

In response to Zalk's proposed findings of fact, Uhl again conceded he did not know whether other people thought his diabetes was an impairment.

The undisputed evidence shows nothing from which a jury could find a causal connection between Uhl's demotion and any perception by Zalk that he was disabled. The grant of partial summary judgment to Zalk is, therefore, AFFIRMED.