**Michele L. MARTIN, Plaintiff**

v.

**ALLEGHENY AIRLINES, INC., d/b/a U.S. Airways Express, Defendant**

**No. CIV. 1:CV–99–0427.**

United States District Court, M.D. Pennsylvania.

March 17, 2000.

Gregory M. Feather, Handler, Henning & Rosenberg, Harrisburg, PA, for plaintiff.

Todd J. Shill, Rhoades & Sinon, Harrisburg, PA, M. Elizabeth Ortego, Ford & Harrison, LLP, Atlanta, GA, Reagan F. McClellan, Atlanta, GA, for defendant.

## MEMORANDUM

RAMBO, District Judge.

Before the court is Defendant's motion for summary judgment. The parties have briefed the issues, and the motion is ripe for disposition.

## I. *Background*

This is an employment discrimination action wherein Plaintiff Michele Martin alleges violation the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, in that Defendant, Allegheny Airlines, Inc., ("Allegheny"): (1) failed to award Plaintiff a promotion because of her disability; (2) subjected her to a hostile work environment; and (3) constructively discharged her because of the hostile work environment. Except where noted, the following facts are undisputed by the parties:

Allegheny hired Martin in June of 1992 as an Accounts Payable Coder. Just prior to beginning work for Allegheny, Martin obtained an associates degree in accounting. Martin later received an associates degree in business administration in December 1996. At the time she was hired, Martin had no prior work experience in the field of accounting.

As an Accounts Payable Coder, Martin was responsible for reviewing invoices to determine which general ledger account code the items contained on the invoice should be applied to, and manually filling out the coding slip to correspond to the correct account. While the Accounts Payable Coder position did sometimes involve using Merlin, Allegheny's computer inventory system, it did not require use of a regular personal computer. Martin admits that an Accounts Payable Coder's use of Lotus (a computer spreadsheet program often used in the field of accounting) was very limited. As a result, no one at Allegheny ever had the opportunity to see Martin's computer skills and spread-sheet capabilities.

Martin reported directly to the Accounts Payable Supervisor, who at the time she started working, was Deb Offenger. Offenger was subsequently replaced by Jeff Otto, who was later replaced by Tim McMasters. During this time, the Accounts Payable Supervisor reported to the controller, Lisa Coldren Coover Tucci, who ultimately reported to the Vice–President of Finance, Scott Strohm.

Approximately one year after Martin began working at Allegheny, she received her first performance evaluation during a meeting held by Offenger and Tucci. While her evaluation was good overall, with respect to her attitude toward the company, managers, and associates, Martin was informed that she "expresses personal feelings and frustrations openly," "says what's on her mind," and "can improve by channeling things in a more positive manner." When Offenger specifically discussed these comments with Martin, Offenger advised her that she needed to keep her "frustrations in check." Under the "working relationship" section, Martin received only a "satisfactory" score.

Martin's second evaluation was due in early summer of 1994. However, because Otto had only recently become her supervisor, Martin did a "self-evaluation." Overall she rated her performance as good, with individual scores ranging from satisfactory to excellent. Martin gave herself her lowest mark, a satisfactory, on "confines dissatisfaction to [ ] herself." In a subsequent evaluation, McMasters gave his lowest marks to Martin on items relating to her interpersonal skills. McMasters's satisfactory ratings in this section indicated that he felt she needed improvement with her interpersonal skills. (McMasters Dep. at 51–53.) He warned her of her "need to develop a kinder, gentler attitude towards the workplace," and that she "needs to work on tactfulness." Martin admits that based on these various performance evaluations she was aware that Allegheny or its managers had concerns about her interpersonal skills.

McMasters perceived Martin to be "definitely the most negative person" in her department. (McMasters Dep. at 29.) He testified that "she was probably . . . one of the more negative people [he] has ever met." (*Id.* at 31–32.) McMasters received complaints from other employees Foose and Loomis about Martin's attitude. (*Id.* at 38–39.) Strohm also observed that Martin conveyed a negative attitude towards employees at Allegheny. He testified that on numerous occasions she was sarcastic to the point of being disrespectful. He testified that other employees Doug Horn, Jim Eppley, and Deb Hoke commented to Strohm about Martin's negative attitude. (*Id.* at 32.) However, when asked in his deposition about whether Martin "ever display[ed] a negative attitude towards [Eppley] or towards her job," Eppley responded that she did not. (Eppley Dep. at 8.) In reference to her interpersonal skills, as they related to Eppley, he responded "Professional, to the point, no time wasting, down to the business at hand and getting answers." (*Id.* at 9.) He also testified that she displayed a positive attitude a lot of times, her attitude compared to other employees was "even keel," and she was "extremely jovial. Always seemed to have a good attitude, pleasant in my dealings." (*Id.* at 10–11.)

Allegheny hired Tammy Kreider in 1988 as an Accounts Payable Coder. Prior to coming to Allegheny, Kreider had worked in the accounting department at a car dealership. She has an associates degree in accounting. Foose, Director of Human Resources, stated in her affidavit that Kreider always received good to excellent scores under the interpersonal skills and attitude sections of her performance evaluation. (Def.'s Ex. A.) In 1993 Kreider transferred into the treasury analyst position where she continued until her promotion in the summer of 1997. As a treasury analyst, Kreider worked daily with computer spreadsheets, specifically Lotus.

The position of Accounts Payable Supervisor, the position on which the instant controversy concerns, which was awarded to Kreider instead of Martin, is responsible for, among other things: managing the work flow for each Accounts Payable Coder, resolving any problems with vendors or other departments, and acting as a financial analyst. This involves maintaining various spreadsheets such that knowing computer spreadsheet programs, like Lotus and/or Excel, was a necessary requirement for the position. Allegheny asserts that the Accounts Payable Supervisor position requires good interpersonal skills and computer skills.

On June 6, 1997 Martin was diagnosed as having "probable multiple sclerosis." Martin's doctor put no physical limitations on her but warned her not to push herself or tire herself out. Martin's diagnosis did not prohibit her in any way from performing the duties of her job as an Accounts Payable Coder and would not have prevented her from performing any of the duties of the Accounts Payable Supervisor. In addition to informing her co-workers of her diagnosis, Martin also informed McMasters, Strohm, and Doug Horn, the acting president of Allegheny at the time. Strohm and McMasters expressed their sympathy and asked if there was anything they could do for her. When Martin informed Horn of her diagnosis, she also told him about her interest in the Accounts Payable Supervisor position and expressed concern that her chances would be ruined because of her condition. Horn reassured her that she would be considered for the position and that her diagnosis would not play any part in the promotion decision.

At Allegheny, the promotion process in the Finance department was informal. As a result, when it was rumored that the position of Accounts Payable Supervisor might be opening, Martin expressed to Strohm and McMasters that she was interested in the position. Strohm and Tucci discussed who should replace McMasters

as the Accounts Payable Supervisor.[1] Strohm testified that both he and Tucci thought that Kreider was the best qualified to do the job. (Strohm Dep. at 22.) He testified that Kreider was best qualified because she had been at Allegheny for nine to ten years, had a broad-based background in accounting, had computer skills, and had good interpersonal skills needed for supervising staff. (*Id.*) Strohm and Tucci thereafter discussed with McMasters who should be chosen. Because Martin had expressed interest in the position, Tucci, Strohm, and McMasters also discussed her for the position. However, Allegheny asserts that they did not think Martin could be promoted to a supervisor position because of her negative attitude. (McMasters Dep. at 27; Strohm Dep. at 29–30, 45.) McMasters testified that Martin was not a good role model and would not have provided good leadership. (McMasters Dep. at 59.) Additionally, Strohm testified that Martin did not have as broad a base of experience in accounting as did Kreider. (Strohm Dep. at 37.) And, although Strohm knew Martin had taken a class in computers, she had not demonstrated at Allegheny the computer skills required for the financial analyst duties of the position. (*Id.* at 37–38.) Martin, however, argues that she was not given the opportunity to demonstrate her computer abilities.

Strohm and McMasters offered Kreider the Accounts Payable Supervisor position. Shortly after Kreider accepted the position, Strohm and McMasters met with Martin and advised her that they had awarded the position to Kreider. Strohm mentioned Kreider's seniority and stated that they did not feel Martin had the requisite interpersonal skills for the position. During this meeting, Strohm told Martin that he expected her to be cooperative with Kreider, her new supervisor, and told her that if she gave him any problems in this regard, she would be on the "outside looking in." (Strohm Dep. at 55–57; Martin Dep. at 70–73.) At no point in this meeting was Martin's probable multiple sclerosis ever mentioned. In fact, no one at Allegheny ever brought up Martin's probable multiple sclerosis with regard to the promotion decision.

Martin claims that after June 30, 1997 her workplace became a hostile work environment. In support of her claim, Martin avers that Tucci came to her less often for assistance on projects. (*Id.* at 138.) Additionally, Martin contends that Tucci would act uncomfortable and try to avoid conversation. (*Id.* at 146–47.) On one occasion, after Martin ran into Tucci in the bathroom and had to force a conversation with her, Martin asked McMasters what was wrong with Tucci. McMasters responded that she thought Tucci was fine. Martin does not claim that her question to McMasters was a "complaint" or a request that he intercede on her behalf. (*Id.* at 148–49.)

During the summer and fall of 1997, Strohm at times inquired about Martin's medical problems. Martin believed Strohm's inquiries were insincere. She also asserts that he was less friendly and would avoid coming into the Accounts Payable office, or if he did come in, he would avoid her. (*Id.* at 87–88, 152–53.) Martin never complained to anyone about Strohm's behavior.

Drug testing for the flight attendants and pilots at Allegheny was conducted in the bathrooms at the office where Martin worked. As a result, on days when drug testing was performed, access to that bathroom was blocked for an hour or more at a time. Noticing that the bathroom with the handicap stall was being used for testing, Martin and a coworker with rheumatoid arthritis discussed their concerns with McMasters. In response to their complaint, McMasters immediately spoke with Foose who responded by permanently relocating the drug testing to another bath-

---

1. McMasters was being promoted to fill Tucci's position of Controller because Tucci was planning to leave Allegheny in the near future.

room. Martin alleges that shortly after the drug testing was relocated to another bathroom, Trang Rioux, a recruiter for Allegheny, commented to another person when Martin and Lindsay walked by, that they were the reason "why we have to go all the way down to the other end of the building now to use the bathroom" to conduct drug testing. (Martin Dep. at 82–83.) Martin claims that she repeated Rioux's comment to a group that was present in the Accounts Payable office, which included McMasters. (*Id.* at 151–52.) However, she also testified that she did not want or expect McMasters to speak with Rioux about the comment, and McMasters did nothing wrong if he did not speak with Rioux. (*Id.* at 152.) On other occasion, Martin overheard Rioux remark, "oh, there's the real image of excellence" as Martin walked by. (*Id.* at 157–58.) It is undisputed that Rioux could not hire or fire Martin and had no authority to alter the terms of her employment.

After Kreider became the Accounts Payable Supervisor, Martin moved into the treasury analyst office effective September 13, 1997. Martin's last day at Allegheny was November 20, 1997. Martin testified that she was not discharged or asked to resign, but chose to resign on her own accord. (*Id.* at 163.)

Martin filed the instant action claiming essentially three violations of the ADA in her single count complaint.[2] She alleges: (1) she was not given the Accounts Supervisor Position because of her disability; (2) she was subject to a hostile work environment based on her disability; and (3) she was constructively discharged because of the hostile work environment of which she was subject. Allegheny has moved for summary judgment on all three of these claims.

**2.** Martin's complaint alleges that in conjunction with the violation of the ADA, Allegheny's actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* However, there is no argument by Martin how this

## II. *Legal Standard*

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *See id.* at 249, 106 S.Ct. 2505. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *See White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in her complaint; instead, she must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

is so, and the court does not believe she sufficiently stated a claim under Title VII on which relief may be granted. Accordingly, the court will examine only the alleged ADA violations.

## III. *Discussion*

The court will first examine Martin's failure to promote claim. Next, the court will consider her hostile work environment claim. And finally, her constructive discharge claim will be examined.

### A. *Failure to Promote Martin to Accounts Payable Supervisor*

█ Martin's claim that she was not awarded the promotion to Accounts Payable Supervisor is properly analyzed under the well-established *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[3] The burden-shifting analysis of *McDonnell Douglas* requires the court to undertake a three-step process in evaluating a motion for summary judgment: First, the plaintiff must establish a *prima facie* case of employment discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 506–07, 113 S.Ct. 2742. The elements of a *prima facie* case of disability discrimination under the ADA for failure to promote are: (1) plaintiff is disabled as defined by the statute; (2) plaintiff was qualified for the job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *See Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir.1998) (*en banc*); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).[4] A successful *prima facie* case creates a presumption of discrimination and triggers the second step of the burden-shifting analysis, in which the employer must rebut the presumption of discrimination by demonstrating legitimate, nondiscriminatory reasons for the employment decision. *See St. Mary's Honor Ctr.*, 509 U.S. at 506–07, 113 S.Ct. 2742. Finally, once the employer proffers nondiscriminatory reasons for its actions, the burden, now an ultimate one, shifts back to the plaintiff for the final step in the analysis. *See id.* at 507, 113 S.Ct. 2742. To avoid summary judgment, the plaintiff must rebut the employer's proffered reasons and show that they are mere pretexts for discrimination. *See id.*

Allegheny argues that Martin: (1) does not meet her *prima facie* case because she was not qualified for the Accounts Payable Supervisor position; and (2) even if she does satisfy her *prima facie* case, she does not offer evidence to demonstrate that Allegheny's proffered reasons for not giving her the position were pretextual.

### 1. *Prima Facie Case*

For the sake of the instant motion, Allegheny does not dispute that Martin's "probable multiple sclerosis" diagnosis qualifies as a disability under the ADA.[5]

---

**3.** Although the burden-shifting framework for analyzing discrimination claims was originally developed in the Title VII context, *see McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817, courts have routinely applied this framework to discrimination claims under the ADA as well. *See Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir.1997).

**4.** The Third Circuit has also held that the fourth element of the *prima facie* case may be met if "the plaintiff could show that the position was filled 'with a person not belonging to the protected category.'" *Matczak*, 136 F.3d

at 939 (citing *Olson v. General Electric Astrospace*, 101 F.3d 947, 951 (3d Cir.1996)).

**5.** In a footnote of Allegheny's reply brief, it argues that "Defendant does indeed dispute Plaintiff's allegation that she is disabled within the meaning of the Americans with Disabilities Act." (Reply at 12 n. 14.) However, there is no argument in either of Allegheny's briefs why this is so, with the exception that in the same footnote described, and in footnote 5 of Allegheny's brief in support of its motion, Allegheny indicates that Martin's medical records state that she was diagnosed with "probable multiple sclerosis" not multiple sclerosis. Nevertheless, the issue of whether Martin was

Allegheny also does not dispute that Martin was rejected for the Accounts Payable Supervisor position, nor that Kreider, who is not disabled, was given the position. Therefore, the only dispute concerns whether Martin was qualified for the position.

The ADA defines the term "qualified individual" as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Interpretive Guidance to the EEOC Regulations divides this inquiry into two prongs. First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires. *See* 29 C.F.R. pt. 1630, app. § 1630.2(m). Second, it must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought. *See id.; see also Deane,* 142 F.3d at 145. Allegheny does not allege that Martin's disability was the cause of her inability to perform the Accounts Payable Supervisor job, as in the second prong, but that she lacked the skill, experience, and other job-related requirements of the position. Therefore, the court need only consider the first prong of the "qualified individual" analysis.

Allegheny asserts that Martin was not qualified for the supervisory position of Accounts Payable Supervisor primarily because she does not have the necessary interpersonal skills to do the job and displays a negative attitude toward the company.[6] (See Defendant's Reply at 6 n. 7.) To substantiate this assertion, Allegheny asserts that the three decision-makers who decided not to give the promotion to Martin, namely Tucci, Strohm, and McMasters were aware of her interpersonal skills problem, and for this reason did not give her the promotion. Allegheny also points to employee reviews of Martin, at least one written by McMasters, that gave Martin her lowest marks in areas such as interpersonal skills. He warned her of her "need to develop a kinder, gentler attitude towards the workplace," and that she "needs to work on tactfulness." Martin admits that based on these various performance evaluations she was aware that Allegheny or its managers had concerns about her interpersonal skills. Allegheny also evinced evidence that McMasters and Strohm received complaints about Martin's interpersonal skills problems from other employees.

Martin challenges the assertion that her interpersonal skills make her unqualified for the Accounts Payable Supervisor position. She argues that one of the managers, Jim Eppley, testified that she often displayed a positive attitude, she interacted well in relation to him, and compared to other employees Martin was "even-keel." Martin also argues that Allegheny did not have any concrete grounds used for determining who was promoted to Accounts Payable Supervisor, but that it was primarily the discretion of Strohm. (Strohm Dep. at 13.)

■ The court is inclined to agree that, even in the context of a supervisory position, the attributes of interpersonal skills and a positive attitude are too subjective criteria to be used in determining whether an employee is qualified. "[W]hile a court may consider objective job qualifications in

---

disabled according to the ADA would not affect the outcome of the instant action.

**6.** Additionally, Allegheny asserts that she is not qualified for the financial analyst aspect of the position, because she does not possess, or has not displayed, the computer skills necessary for the position. (See Defendant's Reply at 6 n. 7, 7.) However, because of the

extraneous location of this argument, in Defendant's reply brief, and the lack of substantial evidence to support this argument, the court is not persuaded that this demonstrates that Martin was not qualified for the position based on a lack of demonstrated computer skills.

evaluating the prima facie case, a subjective qualification 'such as leadership or management skill is better left to consideration of whether the employer's nondiscriminatory reason for the discharge is pretext.'" *Volk v. Pribonic,* Civ. A. No. 94–2165, 1996 WL 230103, at *5 (W.D.Pa. Jan.16, 1996) (quoting *Sempier v. Johnson & Higgins,* 45 F.3d 724, 729 (3d Cir.1995)). Accordingly, Martin's alleged poor interpersonal skills should not be considered in evaluating her *prima facie* case, but will be discussed in the pretext section, *supra. See Nicholls v. Wildon Industries, Inc.,* No.C.A. 98–6697, 1999 WL 1211656, at *5 (E.D.Pa. Dec.10, 1999) (citing *Volk,* 1996 WL 230103, at *5). The court is not convinced that, as a matter of law, Martin did not possess the required interpersonal skills to be qualified for the Accounts Payable Supervisor position. Accordingly, the court finds that Allegheny has not demonstrated that Martin fails to satisfy her *prima facie* case.

### 2. Allegheny's Proffered Reasons

Pursuant to the second step of the *McDonnell Douglas* framework, Allegheny must now articulate a legitimate, nondiscriminatory reason for not awarding Martin the promotion. At this stage, Allegheny merely bears the burden of production. *See Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). Thus, in order to satisfy its burden, Allegheny need not actually prove its reasons for not promoting Martin. Instead, Allegheny satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that its reasons for not promoting Martin were nondiscriminatory. *See id.,* 32 F.3d at 763.

Allegheny has sufficiently satisfied this minimal burden of production by articulating legitimate, non-discriminatory reasons for deciding to promote Kreider over Martin. Allegheny asserts that it chose Kreider because: (1) She performed well in her positions at Allegheny and demonstrated good interpersonal skills; (2) She had sig-

nificant seniority at Allegheny in that she had worked in the Finance department for nine years when the position became available; (3) She had a broad base of experience in accounting and finance based on: her accounting experience before Allegheny, her work as an Accounts Payable Coder for years, and her work as a Treasury Analyst; and (4) She had demonstrated her ability to work with computer spreadsheets as required for the financial analyst duties of the position while she was a Treasury Analyst.

### 3. Are Proffered Reasons Pretextual?

The burden now shifts back to Martin to rebut Allegheny's proffered reasons for not promoting her. The Third Circuit has capsulized the third step in the *McDonnell Douglas* burden-shifting analysis as follows:

> [T]o defeat summary judgment when the defendant answer the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must ... either (i) [discredit] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reason, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case.

*Fuentes,* 32 F.3d at 764 (citations omitted). Martin rebuts Allegheny's proffered reasons via the first alternative, discrediting them based on mainly circumstantial evidence. Martin argues that there are inconsistencies and factual issues surrounding Allegheny's proffered reasons for promoting Kreider over Martin which are fatal to the instant motion. In order to avoid summary judgment by discrediting Allegheny's proffered reasons:

[P]laintiff cannot simply show that [Allegheny's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [Allegheny], not whether [Allegheny] is wise, shrewd, prudent, or competent. Rather, the non-moving [P]laintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in [Allegheny's] proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence, and hence infer that [Allegheny] did not act for the asserted nondiscriminatory reasons.

*Id.* at 765 (internal quotations omitted).

█ In order to demonstrate inconsistencies or contradictions in Allegheny's first proffered reason, concerning Martin's problem with interpersonal skills contrasted with Kreider's good interpersonal skills, Martin presents two sources of evidence. First, regarding Allegheny's assertion that Martin had poorer interpersonal skills and a negative attitude, Martin elicits testimony from Eppley, a manager at Allegheny, who stated that he personally saw no problems with Martin's attitude. In no way does this impact on the fact that the three decision-makers at Allegheny—Strohm, McMasters, and Tucci—witnessed, reviewed, and discussed Martin's interpersonal skills problem. Martin uses Eppley's testimony, not only because it describes her as having a positive attitude, but also because McMasters testified that Eppley was among the employees who complained about Martin's attitude. Although this is an inconsistency in Allegheny's position, there is enough evidence in the record that the decision-makers of Allegheny believed Martin had interpersonal skills problems that the minor inconsistency does not rise to the level to persuade a jury that Allegheny's proffered reason

lacks credence.[7] Second, Martin challenges Allegheny's assertion that Kreider had good interpersonal skills by arguing that one of Kreider's yearly reviews was not entered into evidence. However, all of Kreider's other yearly reviews demonstrate her good interpersonal skills and Foose, Director of Human Resources, verified in her affidavit that Kreider always received good to excellent reviews in this area. Martin's bald assertion that Kreider's interpersonal skills might not be as good as Allegheny purports lacks any foundation and is contrary to the evidence presented by Allegheny.

█ Allegheny's second and third proffered reason for choosing Kreider instead of Martin both concern Kreider's experience at Allegheny and in particular accounting experience. Evidence in the record indicates that Kreider had been with Allegheny for between three and five years longer than Martin had when the Accounts Payable Supervisor position became available. And Kreider had worked as a Treasury Analyst as well as a Accounts Payable Coder. Allegheny asserts that this experience made her more qualified than Martin. Martin attempts to discredit this reason with some of the testimony by McMasters. He testified that he didn't "think there is any one particular department that would give you more skills for the [Accounts Payable Supervisor] position, other than the [Accounts Payable] department that already exists. [He means] the department the job is going to supervise." (McMasters at 15.) Martin asserts that this is inconsistent with the fact that Kreider had been working in the Finance Department prior to the promotion. However, the court does not agree that this alleged discrepancy could discredit Allegheny's professed value in Kreider's expe-

---

**7.** This minor inconsistency, Eppley's name mentioned within a group of employees who complained about Martin's attitude, could be as minor as a mistaken name. Contrasted with all the other evidence of Martin's interpersonal skills deficiency: yearly reviews, other employees' complaints, and decision-makers' first-hand knowledge, the court finds that no reasonable jury could find Allegheny's proffered reason unworthy of credence.

rience at Allegheny.[8] Accordingly, the court does not believe that Martin has cast sufficient doubt on these proffered reasons so that a jury could find them pretextual.

Martin also attempts to discredit Allegheny's fourth proffered reason for promoting Kreider, her demonstrated computer skills. Martin asserts that she herself was never given the opportunity to demonstrate her computer skills to the decision-makers. However, while this may be true, it does not cast any doubt as to the credibility of Allegheny's proffered reason that Kreider's proven computer skills were valued by the decision-makers. "Pretext is not demonstrated by showing simply that the employer was mistaken in its business judgment." *Grove v. H.E.F., Inc.*, No. CIV.A. 97–CV–373, 1998 WL 107179, at *3 (E.D.Pa. March 11, 1998) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir.1995)). In a Title VII case of discrimination on the basis of religion, one district court stated: "The question is not whether [Defendant's] decision ... was an error of business judgment, but whether [Plaintiff] was discriminated against because of his religion." *Weiss v. Parker Hannifin Corp.*, 747 F.Supp. 1118, 1128 (D.N.J.1990) (citing *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.1979)). Martin does not argue that her computer skills were superior to Kreider's, but that the decision-makers did not give her a chance to prove herself. At worst, not giving Martin a chance to demonstrate her computer skills, might be considered bad business judgment. There is no indication, however, that the decision-makers considered Martin's disability in making their decision, and no evidence to demonstrate pretext was produced by Martin.

The last argument Martin makes in attempting to demonstrate that Allegheny's proffered reasons are pretextual is that the timing is very close between when she advised her supervisors of her diagnosis of probable multiple sclerosis and when the decision-makers made the decision to promote Kreider instead of Martin. Although a court may consider timing in assessing discrimination, "[t]o consider timing ... in relation to a dismissal [or failure to promote] as evidence of discrimination, there must be some logical connection between the timing ... and the possibility of the *particular discrimination at issue.*" *Walton v. Mental Health Ass'n. of Southeastern Pennsylvania*, 168 F.3d 661, 669 (3d Cir.1999) (emphasis added). In the case at bar Martin does not present evidence of such logical connection or even allege any such connection. *Cf Cinelli v. U.S. Energy Partners*, 77 F.Supp.2d 566, 578–79 (D.N.J.1999) (denying summary judgment and considering timing of discharge when plaintiff's "disclosure of fatal illness was virtually contemporaneous with his discharge, *and* because [plaintiff] has produced evidence that his employer had doubts about his ability to perform because of his 'current [medical] situation.' ") (emphasis added).

The court finds that Martin has not adduced sufficient evidence to challenge any of Allegheny's proffered reasons for choosing to promote Kreider to the Accounts Payable Supervisor position instead of Martin to the extent that a reasonable jury would find Allegheny's reasons unworthy of credence and pretextual. Accordingly, the court will grant summary judgment in favor of Allegheny on the failure to promote claim.

**B.** *Hostile Work Environment*

Allegheny argues that Martin's ADA claim asserting a hostile work environment also must fail. The Third Circuit has outlined the elements necessary to support such a claim as follows:

> other accounting experience outside of Allegheny.

---

8. This is all the more true because Allegheny's proffered reasons also expressed the added value the decision-makers felt in Kreider's

A claim for harassment based on disability, like one under Title VII, would require a showing that: (1) [Martin] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [Allegheny] knew or should have known of the harassment and failed to take prompt effective remedial action.

*Walton,* 168 F.3d at 667. Allegheny argues, *inter alia,* that the individual incidents Martin sets forth which allegedly demonstrate the hostile work environment neither: (1) are based on Martin's disability, nor (2) are severe or pervasive so as to alter the conditions of Martin's employment. The analysis of the hostile work environment claim has a subjective and an objective component: the evidence must establish that the environment would be perceived by a reasonable person as hostile or abusive and that Martin did, in fact, perceive it to be so. *Harris,* 510 U.S. at 22, 114 S.Ct. 367.

 The court agrees with Allegheny that the incidents alleged by Martin were not severe or pervasive so as to alter the conditions of her employment. The incidents Martin cites are as follows: comments by a co-employee, Trang Rioux, first, that Martin and a co-worker with a disability, were the reason "why we have to go all the way down to the other end of the building now to use the bathroom" to conduct drug-testing, and second, referring to Martin, "oh, there's the real image of excellence;" after learning of Martin's diagnosis, Tucci, did not ask for assistance from Martin as often and tried to avoid eye contact or converse with Martin as often; Strohm was not as friendly and did not go to the Accounts Payable Office as often; a statement by Strohm toward Martin, after Kreider received the promotion

Martin desired, that if Martin did not cooperate with Kreider, she would be on the "outside looking in;" and Strohm asking about Martin's medical problems which Martin interpreted as insincere.

In determining whether an environment is objectively hostile or abusive, the court considers all of the circumstances, including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. To be "pervasive" the incidents "must be more than episodic, they must be sufficiently continuous and concerted." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also Harris v. Smithkline Beecham,* 27 F.Supp.2d 569, 578 (E.D.Pa.1998) (holding that a "plaintiff cannot rely upon casual, isolated, or sporadic incidents to support her claim of hostile work environment harassment"). Some of the alleged incidents, such as Tucci's and Strohm's attitude toward Martin, appear to amount to no more than a personality conflict, and "[i]nsensitivity alone does not amount to harassment; the ADA, like Title VII, is not in effect a 'general civility code.'" *Cannice v. Norwest Bank Iowa N.A.,* 189 F.3d 723, 726 (8th Cir.1999) (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). The comments by Rioux, even though interpreted to be offensive by Martin, are not threatening or abusive. The court finds that the alleged incidents, even taken as a whole: are not severe and either physically threatening or humiliating; are not sufficiently continuous so as to be pervasive; and do not rise to the level that they interfere with her work performance. *See Walton,* 168 F.3d at 667.

Moreover, Martin has not demonstrated that the incidents she asserts as creating the hostile work environment were based

on her disability. While she argues that Rioux's comments concern her disability, this is not apparent on their face. In *Walton*, the Third Circuit denied the plaintiff's hostile work environment claim because, although it was clear that plaintiff's and her supervisor's relationship was poor, plaintiff "ha[d] not asserted facts that would allow a reasonable jury to find that [her supervisor] harassed her because of her disability." 168 F.3d at 667. The court cited, *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997), for the proposition that "([a] personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability."). The court further held that "[t]he fact that [her supervisor's] behavior toward [plaintiff] may have been offensive does not indicate that it was based on [plaintiff's] disability." *Id.* The case at bar is very similar in that Martin did not produce evidence that the incidents of the Allegheny employees were based on Martin's probable multiple sclerosis.

Accordingly, the court finds that the incidents alleged by Martin are not severe or pervasive so as to constitute a hostile work environment, nor are they based on Martin's disability. Therefore, the court will grant summary judgment in favor of Allegheny on Martin's hostile work environment cause of action.

### C. *Constructive Discharge*

Martin asserts that because her work environment was hostile, she felt compelled to resign as would a reasonable person. However, the court has found that Martin was not subject to a hostile work environment as she claims. To establish a "constructive discharge" claim, Martin must prove that Allegheny "knowingly permitted conditions of discrimination in employment so intolerable" that a reasonable person in her position would have been compelled to resign. *See Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir.1984); *Maher v. Associated Services for the Blind*, 929 F.Supp. 809,

814 (E.D.Pa.1996). Because the court finds that the work environment was not hostile or abusive, a reasonable person in Martin's position would not have been compelled to resign. Accordingly, summary judgment will be granted in favor of Allegheny.

### IV. *Conclusion*

In accordance with the foregoing discussion, the court finds that Allegheny's motion for summary judgment should be granted. An appropriate order will issue.

### ORDER

Based upon the findings in the accompanying memorandum, **IT IS HEREBY ORDERED THAT** Defendant's motion for summary judgment is **GRANTED.** The Clerk of Court is directed to enter judgment in favor of Defendant and against Plaintiff, and to close the case.