# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 01-3505

LEE W. KOSKI,

*Plaintiff-Appellant,*

v.

STANDEX INTERNATIONAL CORPORATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-0671—**John W. Reynolds**, *Judge.*

———————

ARGUED FEBRUARY 19, 2002—DECIDED OCTOBER 15, 2002

———————

Before COFFEY, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* After working for 28 years at Spincraft, a unit of Standex International Corporation in Wisconsin, Lee Koski lost his job at the age of 56. He responded by filing this action in the district court, alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, *et seq.* The district court granted summary judgment in favor of Spincraft, stating that even if Koski could establish a *prima facie* case of age discrimination, he had not offered enough evidence to support a finding that Spincraft's stated reason

for firing him (inadequate performance) was pretextual. We affirm.

## I

Koski joined Spincraft in 1970 as a methods engineer. During his time at the company, he held a number of positions and received several promotions. In 1987, Koski was promoted from the position of estimator, a job that involved determining how a customer order should be produced and then calculating the cost for the order, to operations manager, which carried the greater responsibility of supervising manufacturing operations. While holding this position, Koski also temporarily assumed the responsibilities of the recently terminated Engineering Manager. Juggling both roles proved too much for Koski, and he was not able to fulfill the responsibilities of the engineering position adequately. In 1993, Del Lamont, who was then the President of Standex and acting General Manager of Spincraft, along with David Schmitz, the Vice President of Financial Administration for Standex, met with Koski about his poor performance. They concluded that Koski should be demoted from operations manager to the position of senior estimator because he was unable to perform successfully in a managerial role. Koski accepted the demotion along with the accompanying pay reduction.

Five years later, on September 29, 1998, Schmitz decided that Koski had to go. The reasons he offered for this decision were Koski's unsatisfactory performance and his continued inability to communicate effectively within the company and with its customers. Because the question whether these reasons were pretextual lies at the heart of Koski's appeal, we review the evidence that both he and the company presented on performance and pretext.

Prior to 1991, Koski received only positive performance reviews. Beginning in January 1991, a variety of supervisors began to record that Koski was moody, had a negative attitude and was not a team player. These comments were intermixed with positive statements, such as one in his October 1994 evaluation that reported that Koski worked hard, was well-informed and had a high degree of judgment.

In August 1994, Schmitz became Spincraft's general manager. Schmitz studied the performance of all the estimators and engineers and then met with Koski in April 1995 to discuss his job performance. During the meeting, Schmitz warned Koski that his job was in jeopardy because of his inability to communicate with the engineering department and other employees, which resulted in a breakdown in the handoff between estimating and engineering. Koski apparently took this advice to heart, because by the time Schmitz reviewed Koski in 1996, things had changed. This time Schmitz noted significant improvements in Koski's behavior. In the review, Schmitz even suggested giving Koski additional management responsibilities. Although Koski was not promoted again, he received merit salary increases in September 1996 and in 1997.

Despite Koski's improvement between 1996 and 1997, in April 1998, Schmitz again expressed concern about Koski's performance. In addition, Schmitz believed that Koski had made disparaging comments about him. Although Koski disputes that he ever made inappropriate remarks about Schmitz, he admits that he and other employees had a conversation about Schmitz on a business trip in Indianapolis. Although Koski's exact words during this conversation are disputed, two employees reported to Schmitz that Koski stated that he was waiting for Schmitz to be fired before he would cooperate with Spincraft management. Schmitz met with Koski to

discuss both the performance issues and the reported remarks. During the meeting, Schmitz told Koski that he was difficult to work with because he was constantly bitter.

This record standing alone would be enough to show that Spincraft regarded Koski as a problem employee by the time it decided to terminate him. Koski, however, argues that there is more to the story and claims that the following evidence reveals that the company's views were not genuinely held. First, he suggests that Spincraft gave shifting and inconsistent reasons for terminating him. At one point Spincraft alleged that Koski was fired because of a longstanding failure to perform, lack of teamwork, negative attitude (including open complaints and disparaging remarks about other employees and management), lack of communication, and poor transition from estimating to engineering. Later, in its response to interrogatories in the proceedings before the district court, Spincraft omitted the assertions that Koski was a poor team worker and made a bad transition from estimator to engineer, but it added charges of moodiness and non-acceptance of criticism along with an inability (as opposed to failure) to perform. In the summary judgment affidavits, Spincraft said that Koski was fired primarily because of his allegedly disloyal statements made to fellow employees on the Indianapolis business trip.

Second, Koski argues that Spincraft's documentary record of his alleged deficiencies is itself suspicious. Many of the documents Spincraft claimed were supportive of its characterization of Koski's performance were not found in Koski's personnel file. Although performance reviews are ordinarily placed in an employee's personnel file, Koski's 1993, 1996, and October 1998 performance reviews were missing when he initially requested the file. Koski also points to his October 1998 performance review as an example of Spincraft's spurious documents.

The 1998 review is the document on which Spincraft principally relied to justify Koski's September 29, 1998 termination, but that review was dated October 6, 1998, seven days after the action in question. Koski also points out that Schmitz destroyed the notes that would have supported the analysis in his performance reviews, including the 1998 performance review—an action that casts doubt on the integrity of Schmitz's later evaluation, in his view. Koski maintains that a jury could infer that the notes never existed or that they would have supported Koski's position had they not been destroyed.

Koski offers a number of other pretext arguments, mostly disputing the findings in Schmitz's evaluation. He asserts that other employees would characterize his performance favorably. Koski also provides testimony that Schmitz had "invented charges" against other older employees to support their termination.

Finally, Koski offers statistical and anecdotal evidence in an attempt to document a pattern at Spincraft of unfair treatment and termination of older employees. He notes that of the 11 employees who were terminated between January 1995 and 1998, six were over 40 and four more were 39. The five under 40 had all worked at Spincraft for less than a year. Only two of the employees terminated were replaced by someone over 40. He also alleges that several employees at Spincraft believe that they were treated less favorably than the younger employees by Spincraft management and that they missed out on opportunities because of their age. Finally, Koski asserts that managers other than Schmitz sometimes made discriminatory remarks, such as "a lot of experience means a lot of bad habits" and "the only thing older employees bring to the table are their bad habits."

After his termination, Koski's duties were assumed by Mike Polacek and Jeff Dudzik, men in their thirties.

Polacek and Dudzik, who were already managers, were each given management titles to perform Koski's duties, even though Koski had not had a similar title while performing the same work.

## II

Before we address the district court's judgment, we pause briefly to address Koski's constitutional claims. Koski argues that the district court's grant of summary judgment violated his due process rights under the Fifth Amendment, citing *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970). We are at a loss to see how *Goldberg* is implicated at all in a case involving a private employer's actions. If Koski is complaining about the court's actions (because the court at least is a governmental actor), he is making a frivolous argument. The Supreme Court has made it abundantly clear that summary judgment has a proper role to play in civil cases, and there is nothing we can or should add to the point.

Koski also claims that the district court violated his Seventh Amendment right to a jury trial, but Koski was never denied any such thing. The district court merely determined that there were no material issues of fact that could be presented to a jury. To the extent that Koski is arguing that Rule 56 of the Federal Rules of Civil Procedure violates the Seventh Amendment, this argument too flies in the face of firmly established law. See, *e.g.*, *Fidelity & Deposit Co. of Maryland v. United States*, 187 U.S. 315, 320 (1902). The Seventh Amendment does not entitle parties to litigate before a jury when there are no factual issues for a jury to resolve.

Turning to Koski's more serious argument, that a material dispute of fact remains as to his discrimination claim, we review the district court's grant of summary judg-

ment *de novo*, examining the facts in a light most favorable to Koski as the nonmoving party, and drawing all reasonable inferences in his favor. *Doe v. Howe Military School*, 227 F.3d 981, 990 (7th Cir. 2000). Because Koski concedes that he does not have direct evidence of discrimination, we evaluate his claims under the ADEA using the familiar *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), construct. At the first stage, the plaintiff has the burden of establishing a *prima facie* case of age discrimination. To do so, Koski must show: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *Id.* at 802. Spincraft concedes for the purpose of summary judgment that Koski would be able to establish his *prima facie* case.

The next step is for the employer to offer a legitimate and nondiscriminatory reason for the challenged decision. Spincraft did so when it pointed to evidence showing that it terminated Koski for several reasons unrelated to his age: 1) chronic job performance problems; 2) failure to communicate with his co-workers as required for his job as an estimator; and 3) inappropriate disparagement of Spincraft management and other employees. Koski does not dispute that Spincraft has produced nondiscriminatory reasons for his termination. He argues instead that the evidence we reviewed earlier is enough to create a genuine issue of fact on the question whether Spincraft's proffered reasons are pretextual.

To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).

Instead, the plaintiff must demonstrate that the employer's reason is unworthy of belief. *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002). Specifically, the plaintiff must show that the "nondiscriminatory" reason is not the real reason at all, but is instead nothing but a cover-up for discrimination. *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996). Among other things, the employee might present evidence that would show "that (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Id.* Spincraft has provided three separate nondiscriminatory reasons for terminating Koski. Koski can pass the summary judgment hurdle only if he can raise a genuine issue of fact as to each one. *Id.*

Koski tried to demonstrate that Spincraft's claims of his poor performance were factually baseless by offering testimony from other employees who believed that he was performing his position well. But, apart from the fact that the relevant inquiry is whether the decision-makers (not fellow employees) genuinely believed that he had problems, see *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998), even Koski agreed that he is an introvert and perceived as moody. This is consistent with Spincraft's characterization of his communication problems. Even if Koski disagrees with this description of himself, that is not enough to rebut the nondiscriminatory reason proffered by Spincraft. *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim.").

Koski also accuses Spincraft of suspiciously changing its reasons for his termination. Although, taking mat-

ters most favorably to Koski, we agree that the company changed its list of reasons over time, it did not do so in any material way. Spincraft may have used different language when describing his termination, but the underlying message remained the same. The stated reasons fall generally under three specific categories: (1) unsatisfactory performance; (2) poor communication; and (3) disparaging remarks. The fact that at one stage Spincraft focused on Koski's lack of teamwork and poor transition from his role as an estimator to an engineer and at another it stressed his moodiness and failure to take criticism means very little when it all boils down to the same underlying problem—Koski's inability to communicate well. A reasonable jury could not find that these discrepancies support an inference that Spincraft's justification is a lie.

Koski further claims that a jury could believe that Spincraft manufactured performance reviews after his termination. Koski has shown that two negative performance reviews found after his termination were not in his personnel file. One performance review was dated a few days after Koski was terminated and the other, supposedly written in 1993, was never signed and in a different format than prior performance reviews. Koski provides similar evidence regarding Schmitz's destruction of notes that would support some of the suspect documents. Once again, giving Koski the benefit of the doubt, it is possible to find that Spincraft manufactured the performance reviews to support its termination of Koski. But again, this is inconsequential, given Koski's own testimony that he was orally informed as early as 1993 about most of the negative comments in the contested performance reviews. He may have disagreed with the comments, but this does not undercut Spincraft's position that it believed Koski's performance was poor.

Last are Koski's alleged disparaging remarks. Koski denies he ever said anything *disparaging* about Schmitz, but he admits that there was a conversation in which Schmitz and the company were discussed, and he does not deny that Schmitz believed he was critical. Even if Koski thinks that termination was an overreaction to these remarks, this does not mean that Schmitz was untruthful when he cited them as a reason for the termination. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001). To do this, Koski would have to prove that Schmitz did not believe that Koski made the remarks and simply used this as an opportunity to terminate him for the impermissible reason of age. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999).

As we have said numerous times, employers may terminate competent employees (older or otherwise) because they do not like them, or, as in this case, because the employee does not respect the employer's authority. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). Whether Schmitz mistakenly believed that Koski made the comments is not the point. *Id.* As long as Schmitz did not terminate Koski because of his age, Koski does not have a claim under the ADEA.

In a final attempt to demonstrate Spincraft's reasons were a pretext, Koski offers deposition testimony from other older employees who were terminated, demoted, or who felt ostracized at Spincraft in an effort to rebut all of Spincraft's proffered reasons. These employees testified that various managers at Spincraft, not Schmitz specifically, have made discriminatory statements against older people and treated younger people more favorably. We agree with the district court that this testimony is not enough by itself to survive summary judgment. First, Koski offers no evidence that Schmitz, the manager that terminated him, ever showed any indication of age discrimination. *Weisbrot v. Medical College of Wisconsin*, 79 F.3d

677, 684-85 (7th Cir. 1996) (finding that the reference to the plaintiff as an "older lady" was not actionable discrimination under Title VII because it did not reflect the views of the decisionmaker). Koski would have to show that the statements "reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). Second, most of the deposition testimony consists of vague statements about how the employees felt. The statement that younger people were generally treated more favorably than older people is simply not specific enough to use as evidence. *Uhl*, 121 F.3d at 1137.

Perhaps realizing this, Koski also offered some evidence that he characterizes as statistical (although it is really just numerical evidence, not "statistical," because it does not apply any known statistical techniques). He notes that the majority of employees terminated after 1995 were over the age of 40 and that 10 of the 11 employees terminated were 39 or older. He further argues that the numbers do not reflect actual discrimination because many employees voluntarily retire after unfair treatment. Again, Koski does not provide specific information that the employees were either terminated or missed out on promotions because of their age. We are not saying that these statements and statistics are wholly irrelevant. Had he offered this information in conjunction with other evidence placing it in context, a factfinder would be entitled to draw any reasonable inferences it chose. See *Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) (Although unrelated discriminatory remarks standing alone will not overcome summary judgment, "[t]o the extent these statements evidence a company policy to eliminate older workers, plaintiffs are entitled to argue their inference to a jury.") But Koski failed to offer the additional evidence that would permit this case to proceed to a jury.

### III

Koski's burden was to offer something that would allow a finder of fact to conclude that Spincraft's stated reasons for terminating his employment were not the real reasons, and that he was a victim instead of age discrimination. The district court correctly concluded that he did not do so, and we therefore AFFIRM its judgment.

A true Copy:

      Teste:

                            _____
                           *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*