Filed 6/8/15  McCoy v. Perris Union H.S. Dist. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| WARREN MCCOY, | D067421 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. RIC1101168) |
| PERRIS UNION HIGH SCHOOL DISTRICT, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Riverside County, Matthew C. Perantoni, Judge.  Affirmed.

Law Offices of Dale M. Fiola and Dale M. Fiola, for Plaintiff and Appellant.

Walsh & Associates, Dennis J. Walsh and George E. Ordonez, for Defendants and Respondents.

INTRODUCTION

Warren McCoy appeals a summary judgment granted in favor of Perris Union

High School District (District) and former principal Penelope Graham on his complaint

for: (1) violation of the Family and Medical Leave Act (FMLA) (29 U.S.C. § 2601 et seq.); (2) retaliation for asserting claims under the FMLA and for age and race discrimination; (3) age discrimination; (4) race discrimination; and (5) intentional infliction of emotional distress. McCoy contends the District retaliated against him and discriminated against him based on his age, race, and FMLA requests when it placed him on a performance improvement plan and gave him negative evaluations for a number of years before he took service retirement. The trial court granted the District's summary judgment, concluding McCoy was not entitled to FMLA leave to care for his mother-in-law or to take his wife to routine doctor appointments and he received negative evaluations based on poor performance rather than any retaliatory or discriminatory purpose. Based on our independent review, we conclude the trial court correctly determined the District was entitled to summary judgment. We, therefore, affirm the judgment.

BACKGROUND

A

McCoy was employed with the District as a teacher from 1983 until he took service retirement in August 2012. For most of his career, McCoy taught physical education (P.E.) at Perris Lake High School (Perris Lake). He also taught history, math, reading, English, adult school and driver's education. He served as the commissioner of the Serrano Athletics League from 1996 to 2006 and was allowed to leave campus during the instructional day to handle league business.

2

In 2003, McCoy was selected as the District's certificated employee of the year. He received a performance review for the 2003-2004 school year in which he was evaluated as meeting standards in all evaluated categories. His request to participate in a five-year evaluation and assessment was granted such that his next performance evaluation was scheduled to occur in the 2008-2009 school year.

B

When the District hired a new superintendent in 2007, its goal was to improve student academic performance and student participation by implementing the District's program improvement plan, which was prepared to comply with the federal No Child Left Behind Act of 2001. Although the superintendent did not prepare new written guidelines, his goal was to raise the bar on what was expected from district employees and students, which he felt was pretty low when he arrived. In the new superintendent's view, the number one way to improve student achievement was to improve the quality of instruction in the classroom. The District attempted to increase employee performance and preferred more frequent teacher evaluations. Steve Swartz, the assistant superintendent of human resources explained, "more frequent evaluations allows for more frequent constructive criticism, this helps to increase the potential of improved teacher performance in the District, resulting in improved student performance."

In June 2007 the principal at Perris Lake retired and was replaced by an interim principal for a year. In July 2008 Penelope Graham became the new principal at Perris Lake. She made many classroom visits to assess teaching proficiency and she analyzed data to assess student performance. She shifted the focus to high-level interactive

3

instruction. Graham performed more informal observations of teachers during the year of their scheduled evaluation to provide feedback so they could make needed improvements before formal observation and evaluation. She felt some teachers were complacent and did not believe the continuation students at Perris Lake could benefit from structured teaching environments. She also believed, based on her experience as an educator, that implementation of structured lesson plans helps increase student engagement and learning.

C

In September 2008 the assistant principal notified McCoy that he had left his class unattended before the bell rang. The students reported McCoy had locked up and left before the bell rang and McCoy was seen talking to another staff member in another area. On another occasion, Graham asked to see McCoy about her observation of half of his students playing volleyball while the other half sat in the bleachers.

In February 2009 Graham observed one of McCoy's classes and issued an observation report stating 14 students sat on the bleachers talking while 16 students played volleyball. Of the eight to 10 students assigned to play basketball, only three or four actively participated in the activity. The others stood in groups talking. McCoy walked around periodically talking to his students, but did not offer instruction. Additionally, Graham observed six different students who were not in his P.E. class stop by to talk to his P.E. students for extended periods of time. McCoy did not ask those students to leave. Graham also observed several boys loudly using profanity and McCoy did not ask them to stop. McCoy ended the class 10 minutes early. Graham

4

recommended McCoy require all students to actively participate in his class. She also recommended he instruct and monitor his students throughout the class period, including not allowing his students to use profanity or other students to "hang-out" in his P.E. class. Finally, she recommended McCoy teach until the bell rang, noting there was no reason to end the class 10 minutes before the bell rang because the students did not change clothes for P.E. class.

McCoy was placed on an improvement plan in March 2009. Specifically, the plan suggested McCoy adhere to the P.E. curriculum and actively instruct students accordingly. It required McCoy to submit daily lesson plans on a weekly basis. The improvement plan recommended McCoy require all students to participate actively in his class and to implement an incentive plan to encourage participation. It required McCoy to monitor his students' progress, to redirect his students who were off task, and to stop inappropriate conduct by his students such as the use of profanity or throwing balls at one another. Finally, it required McCoy not to permit students who were not in his class to "hang out" during P.E. The purpose of the improvement plan was to make McCoy aware of deficiencies so he could improve prior to his upcoming evaluation.

When McCoy did not comply with the directives of the improvement plan, Graham held a number of conferences with McCoy and his union representative. They discussed the need for revisions to his lesson plans to comply with the model P.E. content standards and ongoing problems during his classes with over half of his students sitting in the bleachers or standing in groups talking rather than participating. They also discussed the need for McCoy to actively and explicitly teach his students sport skills as well as

5

team play.  An observation in April 2009 showed some improvement, but still noted not all students were participating and practice was not organized or monitored.  In McCoy's formal evaluation dated April 21, 2009, 12 out of 17 evaluation categories were marked as unsatisfactory and five were marked as needing improvement.

Prior to this written formal evaluation, McCoy submitted a complaint of racial and age discrimination against Principal Graham.  He added a claim of retaliation the day he received his evaluation.  McCoy complained:  (1) he and another African-American teacher had their classrooms moved to an isolated area; (2) he had been singled out and held to higher performance expectations than other teachers and Graham held unrealistic expectations of the students in his P.E. classes; (3) two teachers were terminated because they were of Asian descent; and (4) his negative performance evaluation was in retaliation to an informal observation by Graham when he had his students standing in the shade on a hot day.  The District's chief human resources officer responded to the complaint and concluded there was no discrimination or retaliation.

By October 2009 Graham noted some improvements in McCoy's classes.  She commended him for working to increase student participation, noting the number of students who were not engaged had reduced over previous observations.  She also commended him for adding a period of calisthenics to the beginning of each class.  However, she recommended he closely monitor all P.E. activities.  She observed a group of girls who were talking move to the center of the field where a game of flag football was being played.  Graham noted they were nearly run over several times while the game

6

continued. She also noted the importance of consistently approaching students who are not participating to encourage them to participate.

The bell schedule changed in the 2009-2010 school year because bus routes were changed within the District. Additionally, sports at Perris Lake changed to an after school extra-curricular activity rather than an activity during the instructional day. McCoy's P.E. class size increased from 45 students to 55 students due to an increase in student attendance at Perris Lake, as well as other class scheduling. The class size was within the maximum limit of 55 students required by the union collective bargaining agreement (CBA).

In February 2010 McCoy filed a complaint with the Department of Fair Employment and Housing (DFEH) asserting discrimination based on race, age and retaliation. The case was closed in October 2010 because McCoy elected to pursue a court action.

In March 2010 Graham conducted another observation and commended McCoy for a clearly stated lesson plan, demonstration of every step of the lesson with opportunity to practice before playing a game and debriefing the game. She encouraged him to include all of these components every day.

McCoy's evaluation in May 2010 was improved with nine out of 17 evaluation categories marked as meeting standards (the highest rating) and eight marked as needing improvement. There were no unsatisfactory marks. McCoy was commended for working to increase student participation, for adding calisthenics to the beginning of his P.E. classes and for implementing well-planned lessons for both formal observations.

7

The evaluation recommended planning and delivering effective P.E. lessons every day, instructing from the time of the first class bell to the end of class bell, consistently encouraging students to participate, and arriving at staff meetings on time. It recommended continuation of the improvement plan.

On May 4, 2010, McCoy submitted a request to take sick leave the next day for two of his class periods to pick up his son from school. Graham informed him this did not qualify as sick leave and he had already used his personal discretion leave for the year. Graham also reminded him of his contractual work hours under the CBA. McCoy then indicated the real reason he had to leave was because his mother-in-law was ill. Although Graham directed McCoy to stay at work, he left in the middle of the day when his mother-in-law called saying he had to come home due to an emergency.

Thereafter, District personnel met with McCoy to address his absences. At that time, he had accumulated 27 days of full or half sick days for the year. McCoy explained his mother-in-law and wife had health issues, which precluded them from driving.[1] He also said he needed to pick up his son a couple of days a week.[2] Since McCoy had used

---

[1]     McCoy and his wife were in an automobile accident in 2002. His wife broke her arm and leg, which required some initial therapy. Her leg injury required a rod and apparently she did not drive. McCoy mentioned his wife's injuries when he spoke with Schwartz about his absences. At that time, his wife was not undergoing therapy and only required routine checkups.

[2]     McCoy's son was homeschooled from 2001 to 2008. Once a month, McCoy would take his son to turn in assignments and pick up homework. The last year McCoy's son was homeschooled (2008-2009), coaching hours were moved to after school. McCoy did not coach that year because it interfered with his ability to get his son to and from school.

all of his available paid time for the year, he was allowed to take time off without pay. McCoy was provided with a memorandum memorializing their meetings regarding his absences and directing him to adhere to all applicable policies and procedures for taking and reporting short and long-term absences. It also reminded him of his duty under the applicable CBA to make an effort to schedule medical appointments in a way to minimize the disruption to the District's educational program.

McCoy submitted one request in June 2010 for FMLA intermittent leave to assist with the care of his mother-in-law, but it did not provide a schedule of care or indicate a specific day or time for which he would need to be absent. McCoy was told if he needed to be absent from school to provide the care, he would need to submit a doctor's note. McCoy did not submit FMLA leave requests thereafter. McCoy was never denied the opportunity to take family leave or sick leave to care for his mother-in-law once he completed the form.

In November 2010 District administrators met with McCoy regarding his failure to use the required computer system to input his students' grades. He had some students with no grades and some graded as "no mark" in the system for the grading period. He also did not have assignments recorded. McCoy said he did not know how to use the system. The District made arrangements for McCoy to receive computer training for the grading system.

In December 2010 when the assistant principal performed a formal observation of his classroom, the class was noisy and the majority of students were not engaged. Many students were off task and engaged in conversation, which McCoy did not address. Some

9

students used profanity, which McCoy also did not address. The assistant principal advised McCoy to adhere to the P.E. curriculum, submit daily lesson plans weekly, require all his students to participate, actively monitor his students, redirect or implement appropriate consequences for students using profanity or throwing balls at each other and not permitting other students who were not in his P.E. class to "hang out" in the P.E. area.

By January 2011 McCoy had shown improvement in not allowing " 'wayward' students to loiter in his P.E. class." However, he still needed improvement in six areas and was rated unsatisfactory in five areas. McCoy was directed to plan and deliver effective lessons, encourage student participation, arrive on time to staff meetings and other functions, and input grades using the computer system as required by District policy.

McCoy was provided with a continued improvement plan indicating a need to improve in areas of instruction, adherence to adopted curriculum, student participation, monitoring student progress and behavior, supervision and safety of students and use of instructional time from first class bell to end of class bell. McCoy was warned about being late for meetings and classes and advised he had incorrectly reported absences.

McCoy filed an amended complaint of discrimination with the DFEH contending the District (1) violated numerous rules in the District's agreement and failed to perform periodic reviews, (2) failed to grant leave under the FMLA and the California Family Rights Act to tend to his mother-in-law's medical needs and to pick his son up from school, and (3) retaliated against him. At McCoy's request, the DFEH issued an immediate right-to-sue notice without taking action on the complaint.

10

McCoy had job performance issues throughout the end of the 2010-2011 school year and into the first semester of the 2011-2012 school year. These problems included failure to submit substitute requests in accordance with District policy and procedures, failure to input grades in a timely manner, and failure to provide instruction from the first class bell to end of class bell. His students were not supervised and left during class to hang out in the library. Students and parents complained about McCoy's failure to accurately record student grades or attendance. His lesson plans were vague or he did not follow them. This resulted in a warning letter of unsatisfactory performance in March 2011, a letter of reprimand issued in April 2011, and a notice of unsatisfactory performance issued in December 2011. He was not suspended and McCoy's job performance subsequently improved.

Principal Graham left the school at the end of 2011 and Dr. Narcisco Iglesias became the principal. McCoy did not request a leave of absence in 2011-2012 and was not denied any leave requests.

By February 2012 McCoy had shown improvement in supervision, bell-to-bell instruction, and curriculum. There were still concerns with instructional issues and he was requested to provide detailed lesson plans and to adhere to those plans daily. McCoy's June 2012 performance evaluation by Dr. Iglesias showed improvement with only two marks indicating a need for improvement in instructional areas. McCoy was not disciplined and he was not threatened either with his job or with changes to his job duties. McCoy did not believe Dr. Iglesias discriminated or retaliated against him in any way related to his performance evaluation.

11

D

McCoy filed this action in January 2011. He retired in 2012, taking service retirement. The trial court granted summary judgment concluding McCoy was not eligible for FMLA to care for his mother-in-law because in-laws are not included within the statute and he admitted his wife did not have a serious medical condition as defined by the statute. Additionally, the court determined the District provided legitimate reasons for its actions based on McCoy's poor performance rather than any retaliatory or discriminatory purpose. Finally, the court concluded McCoy raised no triable issue of material fact as to intentional infliction of emotional distress.

DISCUSSION

I

A defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's cause of action or shows that one or more elements of the cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) "On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National,*

12

*Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) We liberally construe the evidence in support of the party opposing summary judgment (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142) and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under the applicable legal standards. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.)

## II

### *Family and Medical Leave Act Claim*

McCoy contends the District interfered with his right to take leave under the FMLA to care for or take his mother-in-law and wife to doctor appointments. The FMLA "provides job security to an employee who is absent from work because of the employee's own serious health condition or to care for specified family members with serious health conditions." (Chin, et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2014) ¶ 12:6, p. 12-3; 29 U.S.C. § 2601(b)(1), (2).) To establish a prima facie case of FMLA interference, an employee must establish (1) " 'he [or she] was eligible for the FMLA's protections, (2) his [or her] employer was covered by the FMLA, (3) he [or she] was entitled to leave under the FMLA, (4) he [or she] provided sufficient notice of his [or her] intent to take leave, and (5) his [or her] employer denied him FMLA benefits to which he was entitled.' " (*Escriba v. Foster Poultry Farms, Inc.* (9th Cir. 2014) 743 F.3d 1236, 1243.) An eligible employee is entitled to FMLA leave "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." (29 U.S.C. § 2612(a)(1)(C).)

13

The Code of Federal Regulations expressly excludes "parents 'in law' " from the definition of parent for purposes of FMLA leave. (29 C.F.R. § 825.122(c) (2015).) Therefore, McCoy was not entitled to take FMLA leave for the care of his mother-in-law.

Similarly, McCoy has not established he was entitled to take FMLA leave to care for his wife at the time he claims the District improperly interfered with his ability to take leave. The Code of Federal Regulations defines serious health condition as "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider." (29 C.F.R. § 825.113(a) (2015).) "Treatment does not include routine physical examinations." (29 C.F.R. § 825.113(c) (2015).) McCoy admitted his wife, who had been in an automobile accident in 2002, was not undergoing therapy and only required routine checkups in 2010 when McCoy spoke with Swartz about his absences.

Even if we were to assume McCoy was entitled to take FMLA leave at the time in question to care for his wife, he did not establish he gave notice of the need for leave or that the District improperly denied his request for leave. There is one notation from September 17, 2009, indicating McCoy submitted a request for sick leave for the following afternoon and then, after the principal requested to meet with him the following morning, he called back in the evening and left a message stating he needed to take off the entire day for "family leave." However, McCoy cites no other evidence showing he informed the District he needed to take time off due to a serious medical condition of either his wife or mother-in-law until May 2010 when he discussed the matter with Swartz. When he did submit a request for FMLA in June 2010, the District did not deny

14

the request, it simply asked for specific dates and medical confirmation. Thereafter, McCoy was not denied FMLA leave or sick leave.

McCoy complains the District interfered with his ability to take FMLA leave by asking him to adhere to work hours and attendance policies and to follow District procedures for requesting and reporting both short and long-term absences. However, an employer may make a reasonable request of an employee without interfering with FMLA leave. (*Chappell v. Bilco Co.* (8th Cir. 2012) 675 F.3d 1110, 1115-1116 [action against employee appropriate for failure to comply with call-in policy]; *Kinds v. Ohio Bell Tel. Co.* (6th Cir. 2013) 724 F.3d 648, 652 [failure to provide medical certification may preclude interference claim].) Therefore, we conclude McCoy cannot establish a cause of action for violation of the FMLA.

## III

### *Retaliation*

McCoy contends the District retaliated against him in violation of either the FMLA or California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) for engaging in protected activity such as asserting his FMLA leave rights and filing charges of race and age discrimination on his own behalf and on behalf of others.

### A

To establish a prima facie case of retaliation in violation of either the FMLA or FEHA a plaintiff must show he or she was (1) engaged in protected activity, (2) the employer subjected him or her to an adverse employment action and (3) there is a causal connection between the protected activity and the employer's action. (*Akers v. County of*

15

*San Diego* (2002) 95 Cal.App.4th 1441, 1453; *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261.)  In reviewing summary judgment of a retaliation claim, we bear in mind the burden-shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 to determining if triable issues of fact exist for resolution by a jury. First, the " 'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' " (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1109.)  In other words, a plaintiff must show a nexus between the protected activity and the adverse employment action. (*Turner v. Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at pp. 1258-1259.)  Second, "[i]f the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action." (*Loggins v. Kaiser Permanente Internat.*, *supra*, 151 Cal.App.4th at p. 1109.)  Third, "[i]f the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation " ' "drops out of the picture," ' " ' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual." (*Ibid*.)

Applying this analysis to summary judgment proceedings, an employer is entitled to summary judgment if it "presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, [nonretaliatory or] nondiscriminatory factors . . . unless the plaintiff

16

produces admissible evidence which raises a triable issue of fact material to the defendant's showing."  (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203.)

Although the evidence must be viewed in the light most favorable to the plaintiff, the plaintiff's subjective beliefs "do not create a genuine issue of fact." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.)  Nor can a plaintiff avoid summary judgment by merely providing *some* evidence suggesting an improper motive for an [adverse employment action].  (*Ibid.*)  Rather, the "plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and [the adverse employment action]." (*Id.* at pp. 433-434.)

### B

Assuming, without deciding, McCoy could meet his prima facie burden of establishing a causal connection between protected activity and any adverse employment action, the District met its burden for the second prong of the analysis by presenting creditable evidence of legitimate nonretaliatory reasons for the alleged adverse employment actions.

### 1

After a change in administration, including a new superintendent in 2007 and a new principal at Perris Lake in 2008, the District increased teacher evaluations to

enhance teacher and student performance.[3]  Graham began observing all teachers, particularly teachers such as McCoy who were due for formal evaluation that year. McCoy was placed on a performance improvement plan in March 2009, before he filed any claims for discrimination.  He was directed to actively instruct students according to P.E. curriculum, to submit lesson plans and to require students to actively participate in class.  The improvement plan required McCoy to actively monitor student progress, to redirect students who were off task, and to stop inappropriate conduct such as the use of profanity or throwing balls at one another.  Finally, it required McCoy not to permit other students to stop by the class to "hang out."  The District submitted evidence McCoy's negative evaluation in April 2009 followed several observations and conferences and was the result of McCoy's poor teaching performance and failure to comply with directives and recommendations rather than any retaliatory purpose.  McCoy continued to have performance issues over the next several years, but he showed improvement.  In 2012, before he took his service retirement, McCoy met standards in all evaluated areas except two instructional areas where he still needed improvement.

---

[3]      McCoy claims the District conducted too many observations and evaluations under the terms of the CBA.  However, a plain reading of the CBA does not limit the number of informal or formal evaluations.  The CBA states members "shall have *at least* one (1) formal observation no later than March 1, if they are being evaluated" and shall receive advance notice of formal evaluations.  (Italics added.)  The CBA does not prohibit informal evaluations.  Nor does Education Code section 44664, subdivision (a), prohibit more frequent evaluations, it provides a minimum number of evaluations:  "[a]t least every other year for personnel with permanent status."

With regard to the change of coaching duties, the District presented evidence coaching was not a part of McCoy's employment duties with the District. In the years he coached, he received a stipend in addition to his regular pay. In 2008-2009, McCoy received stipends for teaching four team sports. When he coached those sports during P.E. classes, he received both his regular pay and a stipend for the same hour of instruction. Additionally, McCoy would pull students out of classes for sports. In 2009-2010, team coaching was moved to after school. McCoy did not apply for a coaching position in 2009 due to his son's school schedule and the change in Perris Lake's classroom bell schedule that year. In September 2010 an e-mail was sent to all certificated staff announcing the availability of coaching positions, which were open on a first-come, first-served basis. McCoy admitted he did not receive the e-mail regarding the availability of coaching positions on the Friday it was sent because he was involved in union negotiations and he was sick the following Monday. By the time he came back to school on Tuesday, the positions were filled. He was allowed to co-coach a team and split the stipend with the other coach.

The District presented evidence McCoy's classroom was moved because he was assigned to teach driver's education and the room was more suitable for those classes due to its size. Additionally, his former classroom was needed for other school purposes. The District presented evidence it did not construct a weight room because there was no budget for the structural changes necessary.

4

McCoy was denied an opportunity to attend a particular training course during the school year because he failed to follow directives to improve his job performance and the District did not believe he would benefit from the program. However, he was not denied the opportunity to attend a P.E. instructional course over the summer.

5

Graham took the school's walkie-talkie radio and master key away from McCoy because he was not a security officer and he did not need those items for teaching. No other teachers had walkie-talkie radios. He was still able to perform his job duties without the key and the radio. He did not file a grievance because it was not a violation of the contract for him not to have master key.

C

Because the District provided evidence of legitimate nonretaliatory reasons for their actions, the burden shifted to McCoy to show the District's articulated nonretaliatory reasons for their actions were merely pretextual. He has not done so.

To show pretext, McCoy relies primarily on the temporal proximity of various claims he submitted and when alleged adverse actions occurred. However, evidence of temporal proximity alone is not sufficient to avoid summary judgment. "[T]emporal proximity, although sufficient to shift the burden to the employer to articulate a [nonretaliatory or] nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and

20

pretextual. [A] contrary argument, if accepted, would eviscerate the *McDonnell Douglas* [*v. Green, supra,* 411 U.S. 792] framework for resolving claims at the demurrer or summary judgment stage, because the same minimal showing required of the plaintiff to raise a prima facie case would also suffice to preclude the employer from obtaining summary judgment notwithstanding otherwise unrebutted proof of articulated legitimate reasons for the employment termination. Instead, an employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual." (*Loggins v. Kaiser Permanente Internat.*, *supra*, 151 Cal.App.4th at pp. 1112-1113.)

McCoy has not shown substantial additional evidence from which a trier of fact could infer the articulated reasons for the alleged adverse employment actions were untrue or pretextual. An inference of pretext may not be drawn from evidence the employee believed he or she performed well or had performed well in prior years. The relevant inquiry is whether the decision makers genuinely believed the employee had performance problems. (See *Koski v. Standex Int'l Corp.* (7th Cir. 2002) 307 F.3d 672, 677-678; *Gross v. Akin* (D.D.C. 2009) 599 F.Supp.2d 23, 31.)[4] There is no evidence McCoy's evaluators did not actually believe McCoy had performance issues between 2009 and 2012. Even considering the declaration McCoy submitted from another

---

4    "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz, supra,* 24 Cal.4th at p. 354.)

physical education teacher taking issue with the substance of the performance evaluations, which, viewed most favorably to McCoy, might show the District's evaluation decisions were unwise or based on incorrect information, the evidence does not show the District's decisions were a pretext.

Additionally, McCoy contends an e-mail denying his request to participate in a week-long seminar during the school year provides evidence of retaliation. In response to an inquiry about whether the District would allow and partially pay for McCoy to attend the conference if he dropped his lawsuit and his complaint to the Public Employment Relations Board (PERB), Swartz stated, "[I]n addition to the lawsuit and PERB complaint, Mr. McCoy has shown little attempt or interest in following any of the directives provided him for improvement in his job performance as documented . . . . The district, therefore, is disinclined to agree to send Mr. McCoy to the Survive and Thrive program." Even if refusal to send McCoy to this particular program could be considered an adverse employment action, which is debatable, this e-mail does not give rise to a reasonable inference of retaliatory intent. The e-mail states the District was disinclined to grant the request because McCoy was not complying with recommendations to improve his job performance and Swartz did not believe McCoy would benefit from the program. If retaliation or leverage were behind the denial, one would expect a different response to a proposal to withdraw the lawsuit and PERB complaint if he was sent to a conference. We also note McCoy was not denied the opportunity to attend a conference for P.E. teachers and coaches over the summer.

Therefore, we conclude McCoy has not met his burden of raising a triable issue of fact regarding his retaliation claim. "[A] plaintiff's 'suspicions of improper motives . . . primarily based on conjecture and speculation' are not sufficient to raise a triable issue of fact to withstand summary judgment." (*Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1564.)

IV

*Discrimination Claims*

A

FEHA makes it unlawful for an employer to discriminate against an employee based on the employee's race or because of the employee's age, if the employee is 40 years old or older. (Gov. Code, §§ 12926, subds. (b), (o), 12940, subd. (a).) To establish a prima facie case of discrimination the plaintiff must provide evidence: (1) he or she was a member of a protected class (e.g., race or age); (2) he or she was performing competently in the position he or she held; (3) he or she suffered an adverse employment action; and (4) some other circumstance suggesting discriminatory motive such as the fact he or she was replaced with someone not within the protected class. (*Guz, supra,* 24 Cal.4th at p. 355; *Rose v. Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1421 [age]; *Fragante v. Honolulu* (9th Cir. 1989) 888 F.2d 591, 595 [race].)

When moving for summary judgment, an employer may proceed directly to the second prong of the *McDonald Douglas* test and present competent, admissible evidence showing it took the challenged action for legitimate, not discriminatory reasons. (*Guz, supra*, 24 Cal.4th at p. 357.) The employer's reasons need not have been wise or correct.

23

Rather, " 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*." (*Id.* at p. 358.)

The plaintiff then has the burden of rebutting the employer's showing "by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred." (*Guz*, *supra*, 24 Cal.4th at pp. 357, 361.) "[A]n inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions." (*Id.* at pp. 360-361.) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Id.* at p. 361.) Thus, "*even after* the plaintiff has presented *prima facie evidence* sufficient to establish an inference of prohibited discrimination in the absence of explanation, and has also presented evidence that the employer's innocent explanation is false, the employer is nonetheless *necessarily* entitled to *judgment as a matter of law* unless the plaintiff thereafter presents *further* evidence that the true reason was discriminatory." (*Ibid.*)

24

" 'Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.' " (*Guz*, *supra*, 24 Cal.4th at p. 362.) A court may grant summary judgment for an employer "where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred." (*Ibid.*)

B

Again, assuming without deciding McCoy can meet his prima facie burden of race or age discrimination, as we have described *ante,* the District presented evidence its actions were based on legitimate nondiscriminatory reasons: (1) the District implemented efforts to improve student performance by improving teacher performance through increased teacher evaluations and increased emphasis on structured teaching methods; (2) over the course of several years, McCoy consistently failed to meet the standards required, although he showed improvement over time; (3) McCoy's coaching opportunities changed as a result of a change in the time sport activities were conducted, because he had family commitments, and because he failed to timely respond to a notice of availability of coaching positions; (5) and McCoy's classroom was changed to a room more suitable for his driver's education class. Graham and Swartz both stated in declarations they did not take any action against McCoy based on his age or race. The District's showing of its reasons was made by competent and admissible evidence and

25

was sufficient to establish McCoy's discrimination causes of action have no merit. (*Guz, supra,* 24 Cal.4th at p. 360.)

McCoy was, therefore, required to raise a triable issue rebutting the District's showing "by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred." (*Guz*, *supra*, 24 Cal.4th at pp. 357, 361.) He has not done so.

McCoy admitted no one at the District made any derogatory comments about his age or race. He admitted in deposition that he did not believe anyone at the District discriminated against him based on his age or race. McCoy's salary and benefits remained the same even when his teaching assignments changed. To the extent McCoy's declaration contradicts this testimony, we disregard it. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 (*D'Amico*); *Scalf v. D. B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1521-1522 [the *D'Amico* rule "bars a party opposing summary judgment from filing a declaration that purports to impeach his or her own prior sworn testimony."].)

To establish pretext, McCoy relies on declarations of other union members—Paul Clay, Susan Stever and Gary Orme—the language of which is substantially identical in many places. These declarations purport to establish a pattern and practice of age or race discrimination by giving anecdotal accounts of other District employees they believe were subjected to age or race discrimination. The District objected to these declarations as speculative and lacking in foundation. The trial court did not rule on the objections. "Evidence submitted for or against a motion for summary judgment must be admissible if

26

being offered at trial."  (*Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 82.)  Although the California Supreme Court has not decided the matter (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535), the majority view is that an appellate court reviews the trial court's evidentiary rulings on summary judgment for abuse of discretion.  (*Kincaid v. Kincaid*, *supra*, at pp. 82-83.)  However, since the court did not exercise its discretion, we may consider them de novo.  (*Reid v. Google, Inc.*, *supra*, at p. 535.)

The declarations submitted contain no foundational facts showing any of these witnesses had personal knowledge of the circumstances around which other older or minority workers were either terminated or suffered alleged adverse employment actions or that their age or race was the reason for the action (as opposed to performance, retirement, job changes, or other neutral circumstances).  The declarants only present conclusory opinions.  Absent such foundation, any inferences to be drawn from the declarations are speculative and irrelevant.  Evidence is not relevant if it has a tendency to prove or disprove a disputed material fact only by resort to speculative or conjectural inferences or deductions.  (Evid. Code, § 210; *People v. Parrison* (1982) 137 Cal.App.3d 529, 539; *Kramer v. Barnes* (1963) 212 Cal.App.2d 440, 446.)  Therefore, we do not consider the declarations for this purpose.

McCoy also relies on some statistical data his attorney gathered regarding the race and age of teachers and administrators at Perris Lake.  However, the statistical sample is very small.  Although " 'statistics have a place in disparate treatment cases, their utility "depends on all of the surrounding facts and circumstances." ' [Citation.]  [Courts have declined] to consider the employee's statistical evidence because ' "statistical evidence

derived from an extremely small universe" . . . "has little predictive value and must be disregarded." ' [Citations.] The problem with a small number, of course, is that slight changes in the data can drastically alter the result." (*Aragon v. Republic Silver State Disposal* (9th Cir. 2002) 292 F.3d 654, 663.) The statistics presented by McCoy do not show " ' "a stark pattern of discrimination unexplainable on grounds other than [race] [or age]" ' " such as job performance. (*Ibid.*) Therefore, McCoy's statistics are insufficient to raise an inference of discrimination.

Because McCoy has not presented substantial and specific evidence required to demonstrate the District's actions were pretext for discrimination, summary judgment was proper.

V

*Intentional Infliction of Emotional Distress*

McCoy's final contention is that he established a triable issue of fact regarding his intentional infliction of emotional distress claim based on discrimination and retaliation. To establish a claim for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant's conduct was outrageous; (2) the defendant intended to cause the plaintiff harm; (3) the plaintiff suffered severe emotional distress; and (4) the defendant's conduct was a substantial factor in causing plaintiff's severe emotional distress. (CACI No. 1600; *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.) An essential element of a claim of intentional infliction of emotional distress is outrageous conduct beyond the bounds of human decency. (*Coleman v. Republic Indemnity Ins. Co.* (2005) 132 Cal.App.4th 403, 416.)

Given our conclusion McCoy is unable to meet his burden to establish the District engaged in discriminatory or retaliatory action, there is no triable issue of material fact as to his intentional infliction of emotional distress claim. Personnel management decisions are not outrageous conduct. (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80.)

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

O'ROURKE, J.

29